[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a dissolution of marriage action brought to the Danbury Judicial District by writ returnable on May 19, 1998. The plaintiff seeks a dissolution of marriage, sole custody, child support, counsel fees and an equitable division of the parties' personal property and a share of a pending workers' compensation claim of the defendant. By cross complaint, the defendant seeks a dissolution of marriage, custody, child support, counsel fees and an equitable division of the assets of the marriage. In the defendant's claims for relief, he seeks `indemnification' alimony but not periodic alimony. The matter was referred to the Regional Family Trial Docket for trial.
The plaintiff, Donna Slavick, and the defendant, John Slavick, were married on May 28, 1994 in Bethel, Connecticut. The court finds that it has jurisdiction over the marriage. Each of the parties has resided in Connecticut for their entire lives.
The court has carefully considered the statutory, case law, and regulatory criteria for the dissolution of a marriage and orders affecting custody, child support, health insurance and health expenditures, day care expenditures, alimony, settlement of issues of the marital estate (both assets and debts), and payment of attorneys' fees (for the children and their parents).
Two minor children have been born to the wife who are issue of the marriage: Tyler John Slavick, born January 22, 1994 and Emily Taylor Slavick, born March 27, 1996. The plaintiff is not currently pregnant. During the marriage, the wife received public assistance for a six month period from March, 1999 through August, 1999, in the amount of $638.00 per month. The State of Connecticut entered an appearance in this matter and determined that it had no interest and would not be pursuing collection of the welfare benefits from either of the parties.
The court finds that the marriage between the parties has broken down CT Page 9044 irretrievably and there is no hope of its reconciliation.
The plaintiff is 33 years old. The highest education she has completed is a college degree, B.Sc. in psychology and health fitness from Springfield College. She is in good physical health.
Her job experience and training is in working with mentally retarded adults and, now, with transitioning welfare recipients to the workforce. Her job history during the marriage is demonstrative of an industrious individual. When she and the defendant met she was working at United Cerebral Palsy in Patterson, New York earning $22,000 per year. In August, 1993 she left that position for a pay increase to $25,000 per year with St. Vincent's Special Needs Center in Bridgeport, Connecticut. She remained there until February, 1999. Thereafter, she collected unemployment for a short while and also was a waitress. She was out of work in October, November, and part of December, 1999 until attaining her current employment which began December 13, 1999. She is currently earning $33,000 per year. She also receives health benefits.
The plaintiff became aware she was pregnant with Tyler in May, 1993. At that point, the parties were living together. They already had a planned wedding date of May 28, 1994 which they had set in August, 1992, when they first became engaged. As of the time of the conception of Tyler, there were already serious problems in their relationship. They argued often. The plaintiff informed the defendant that she would terminate the pregnancy if they did not marry as planned. Voluntary termination of the pregnancy was not an option that the defendant would consider. He committed to the marriage, which occurred, as planned, four months after Tyler was born. The plaintiff was able to take eight weeks off her work from St. Vincent's for the birth of Tyler.
The defendant, John Slavick, is 41 years old. He has a high school education. While he is generally in good health, he lives with a physical condition called syndactylism: he was born with webbed fingers and extra digits of the fingers. This has resulted in numerous corrective surgeries over the years. During the time of this marriage, he was also fighting a staph infection which plagued his pinkie finger. He had ten surgeries during the marriage; this interrupted his employment and required prolonged periods of recovery.
When the parties commenced dating, in April, 1992, Mr. Slavick was unemployed, having been recently laid off after working fourteen years for one employer. He was living in his family home, with his parents and his sister. He had historically lived there. In October, 1992, after the parties' speedy engagement, the plaintiff moved in with the defendant in his family home for a period in excess of one month. Then they found a CT Page 9045 condominium apartment to rent in Bethel; they commenced living there in October, 1992. In August, 1993, prior to the marriage of the parties, the defendant had filed for bankruptcy as a result of feeling inundated by bills from the period of his unemployment. Ultimately, he was discharged in bankruptcy. As a result of all this, throughout the marriage, the defendant had a very poor credit record.
In approximately October, 1992, the defendant found employment performing shipping and receiving services. He stayed with that until April, 1993 when he left as a result of injuring his hand at work. The staph infection continued to plague him. As a result he had surgery on his hand in January, 1994. At the time of Tyler's birth on January 22, 1994, the defendant was unemployed and convalescing from hand surgery. He and the plaintiff cared for Tyler together until her return to work 5 weeks after the birth; thereafter he cared for Tyler while she was at work. In April, 1994 the defendant took a job for one month in a stock room. He left because he could not do the heavy lifting work because of substantial pain in his finger. From the end of May, 1994 to July, 1995, the parties' division of responsibilities in their family was such that the plaintiff worked at her employment days and the defendant provided the care for Tyler while she was at work. He also did the family dinner cooking, dish cleaning and food shopping. In the evening they shared the responsibility of caring for Tyler. During this time, the defendant also sought employment.
In July, 1995, the defendant found employment with a company as a stock room supervisor on the second shift. He remained in that employment for two years. During that time until July, 1997, the parties worked two different shifts. Therefore during the plaintiff's work at the day shift, the defendant took care of Tyler. When he readied to leave for work in the afternoon he took Tyler to his mother's home where his sister, largely, (and his mother to a lesser extent), took care of Tyler, until the plaintiff came to pick him up around 5:30 or 6 p.m., and then, the plaintiff took care of Tyler into the evening. The parties shared the household responsibilities during this time period.
In March, 1996, Emily was born and she became a part of this caretaking schedule, with the exception of the first 16 weeks of her life, when the plaintiff was able to be home with her full time. Throughout this time, the plaintiff remained employed at St. Vincent's.
Throughout the entire time of these children's lives, the defendant's sister, Barbara Slavick has been the default caretaker for the children when neither parent was available. Further, during much of the time when it has been the primary responsibility of Mr. Slavick to be with the children, he has had them around his sister or his mother. Both of these CT Page 9046 parents acknowledge that Barbara Slavick has been an excellent caretaker of the children when they are in her charge. Both of the children are very attached to Barbara Slavick.
After the birth of Emily on March 27, 1996, the plaintiff felt she was 40 to 50 pounds over her pre-childbearing weight, and, that her cholesterol was too high. She was an individual who had always enjoyed physical fitness engaging in organized sports and other fitness activities. She determined that she would once again become fit and therefore joined the same health club the parties had met at in 1992. As of the spring, 1996, she put herself on an exercise regimen at the health club of three weekdays and one weekend day, for about 1 1/2 hours each day. In one year she lost the desired amount of weight. She has kept up the exercise regimen to the current time. The time that the plaintiff spends at the health club has been a source of conflict between the parties both before their separation and since. Mr. Slavick accused her of spending more time at the gym than she acknowledged and that she would be exercising at the gym rather than with the children, leaving them in the care of the aunt, Barbara Slavick. In fact, this is what occurred and therefore, the children were with their mother for only the early evenings before night time sleep, and on the weekends, when she was not at the gym. This became an increasingly difficult and sore subject between the parties. The defendant accused the plaintiff of having an affair, which she denied.
All of this was against the backdrop of a very miserable marriage dating back, even to before the actual nuptials. Tyler, it must be remembered, was born before the actual wedding date. From his birth forward, until only the most recent months, the plaintiff insisted that Tyler sleep with her. The defendant protested against this as not good for either the child or their marriage. Because of the plaintiff's insistence on Tyler in her bed, the defendant moved out of the bed onto the couch. This situation existed from Tyler's earliest weeks right until separation. Therefore, during the entire time of this marriage, these parties did not experience the intimacy of sharing a bedroom. Conjugal relations between the parties were rare and often a source of tension, as well. Many times, the defendant implored the plaintiff to move Tyler out of the marital bed. She never did so.
These parties argued about almost everything. A constant source of disagreement was finances. There was never enough money to pay the household bills. Each party blamed the other for their economic distress. There is credit card indebtedness arising out of purchases during the marriage, all in the name of the plaintiff. The credit card indebtedness was all on cards taken out by the defendant in the name of the plaintiff. The parties dispute whether this was done with the CT Page 9047 knowledge of the plaintiff. This debt totals approximately $10,300. The plaintiff also has two credit cards with Citibank which have total credit card debt of approximately $9,800. They were also used for household purchases during the marriage, although the Visa had a balance premaritally of about $2,500 dating back to the card's opening in 1988. Therefore, approximately $17,500 to $20,000 in debt was incurred by both of the parties for family and household purchases. Given the present economic situation of both of the parties, it is hard to imagine how they will recover from this indebtedness. The parties did not pool their paychecks and pay bills jointly during their marriage. Therefore, in their atmosphere of poor communication or trust, each has hurled recriminations at the other as to irresponsible spending.
The parties fought bitterly the time they lived together. The plaintiff yelled and screamed at the defendant often, and often in front of or in ear shot of the children. The defendant participated as well: while not yelling as frequently, he lacked insight as to how his comments would trigger violent verbal reactions in the plaintiff. Finally, the defendant found himself physically assaulted on occasion by the plaintiff. While the physical assaults did not put him in fear for his safety or well-being, they did have the effect of making him feel demeaned and ashamed.
Throughout the time of the parties' marriage, the defendant maintained a close and loving relationship with his own family. While they lived together, the parties were always welcomed at the Slavick family home. Both the defendant and the plaintiff were devoted to and respectful of Mr. Slavick's father. The image of him that has emerged from this trial is of a loving, strong, and benevolent patriarch of the Slavick household. He passed away from cancer in September, 1997. It would seem that this marriage, already stressed and miserable, proceeded to unravel more quickly after his passing.
In April, 1998, the parties were faced with the necessity of moving. They had been living in a caretaker's cottage on an estate through an arrangement made by the defendant with the estate owner. As a result of development plans of the owner and the inability of the defendant to meet the rent over several months, the parties needed to move. The defendant urged that they move into his family home for an indefinite period of time until they could get on their feet financially. The plaintiff was strongly opposed to that but did not present an alternate plan as to how they could afford independent housing with their finances in such disrepair. They moved into the Slavick family home, putting their furnishings and other belongings into storage. They only took their personal belongings with them. The sleeping accommodations were that the children were to share one room and the parties were to be in a separate CT Page 9048 bedroom. The plaintiff remained there for only four days and then moved out on April 8, 1998. The parties have been separated ever since. It is her position that the move was precipitated by a note from her mother-in-law to both of them that they needed to have good housekeeping. She said it made her feel unwelcome. In fact, she fled because she felt trapped by her situation and wanted to be free of it. She went to live with her father. The children stayed in the Slavick household in Bethel, Connecticut while she set up accommodations for herself and them at her father's. The accommodations she set up were to have the children live in the same bedroom with her, Tyler once again sharing her bed.
The plaintiff had been raised by her father. While she did not see him and her stepmother as frequently as her in-laws, her relationship with them is solid. They are interested and caring grandparents.
Shortly after the plaintiff commenced this dissolution of marriage action, the parties entered into an agreement pendente lite which became a court order. Since May 29, 1998 by court order, the parties have had joint legal custody of the two minor children and a parental access schedule which essentially divides the time with the children in half: the children are with their mother every Monday morning through Wednesday morning and with their father every Wednesday morning through Friday morning, and then the parents alternate the weekends which are defined as Friday morning to Monday morning. In addition, the mother has access to the children every Wednesday and Thursday from 4 to 5 p.m. and every Friday that is not hers from 4 to 5 p.m. The parties, by agreement, utilize Barbara Slavick as the babysitter when they are at work.
In January of this year, Mr. Slavick commenced his present employment as a production planner at a significant salary increase, now earning $38,000 per year, which is about $10,000 per year higher than he earned earlier in the marriage. Ms. Slavick also has procured new employment as a case management worker in administering a welfare to work transition program. She is earning approximately $33,000 per year. This is approximately $5,000 per year more than she earned at St. Vincent's.
During the pendente lite period of this action, the parties underwent an evaluation by Family Services. A recommendation was made by the counselor in February, 1999, which was presented to the parties at that time. The recommendation was for the defendant father to have sole legal and physical custody of the two minor children and visitation by the plaintiff mother on alternating weekends and one afternoon per week.
Shortly after receiving that recommendation, the plaintiff mother became very depressed and started having suicidal ideation. She sought CT Page 9049 out mental health assistance and voluntarily stayed inpatient for psychiatric treatment at a hospital for eight days. Thereafter, she engaged in brief outpatient counseling. She has not been in treatment since. She also left her employment at St. Vincent's in February, 1999. She was overwhelmed by the stress she felt and was not able to work well at that time. She remained largely unemployed until September, 1999, doing some waitressing and collecting welfare for financial subsistence. In September, 1999, she had a short term job which lasted only eight weeks. She then collected unemployment until attaining her current position in December, 1999. During this period from February to December, 1999, Ms. Slavick never sought to have either of the children with her for additional time, notwithstanding knowing that Emily was being babysat and Tyler was as well, when not in school.
From the time that she left the Slavick household on April 8, 1998 to December, 1999, the plaintiff lived with her father and stepmother. This was in Bridgewater, Connecticut. In the end of December, 1999, she moved into the current apartment she lives in Bethel, Connecticut. It has two bedrooms. While it is furnished with borrowed things and newly purchased bunk beds for the children, the plaintiff awaits the receipt of the family furnishings from storage to properly furnish the apartment.
An update to the Family Relations study was completed in the end of January, 2000. In this update, the counselor reviewed what events had occurred since her last report and her analysis of the same. Her recommendation remained for sole legal and physical custody of the children with Mr. Slavick, but with a more expanded visitation schedule for Ms. Slavick. In both this report and the original report, the recommendation for sole custody with Mr. Slavick was couched in language that it was "contingent upon his continuing residence with his mother and/or sister." At trial, the counselor specified that this particularly meant the sister, Barbara Slavick.
The level of hostility between these parents presently (and during the pendente lite period) is extraordinarily high. There is an absolute inability for them to communicate. The court is aware that our law presumes that joint legal custody is in the best interest of children. In the instance of this family; however, it would be a continuing travesty for these children to subject them to a requirement of joint legal custody. The mother of these children has been demanding and assertive rather than conciliatory when dealing with either Mr. Slavick or his sister regarding the care of the children. In July, 1998, she submitted a written demand for a daily report from Mr. Slavick and his sister as to each of the following questions, the information required by her to be provided in hourly increments: did the children eat, and what; did they get a bruise or scratch, have a cough or runny nose or, appear sick; did CT Page 9050 the children leave the house and if so for how long and where did they go; did they nap and for how long; did the children have a bowel movement, use the potty, use a pacifier, watch tv, or fight with each other.
There has been tension between the parties in how to share holidays or be flexible regarding summer schedules so as to maximize opportunities for the children. Both parties have shown stubbornness in this regard.
Tyler is a student at St. Mary's which is an elementary Catholic parochial school in Bethel. The parties agree that he should continue there. That agreement came in the midst of trial when it was apparent from their respective testimony that they supported this. It was not discussed between them previous to court. Emily is of age for preschool this fall. The parties agree that she should go to preschool, ideally at Trinity Day School where Tyler had previously attended. This too, it became clear, was an agreed choice after listening to both parties at trial. They had never discussed it before trial. Ms. Slavick has given up trying to communicate at all with Mr. Slavick because she finds it so fruitless. Mr. Slavick has not attempted to communicate with her directly, either. Barbara Slavick has been caught in the uncomfortable middle position being asked by both parties to communicate messages back and forth. This is an untenable result and cannot be allowed to continue. This court specifically finds that joint legal custody is not in the best interests of Tyler or Emily because there is not the essential trust necessary to facilitate any level of communication necessary for joint custody to be feasible or work in any way.
That being the case, the court must consider what custodial arrangement, then, is in the best interest of Tyler and Emily.
The court must consider among many other factors how these parents treat each other. Ms. Slavick has been physically abusive toward Mr. Slavick. She has a temper with yelling that she is unable to harness effectively. She has unleashed it at Mr. Slavick and at the children's paternal grandmother with no ability to control it. Tyler has witnessed her physically assault his grandmother. Ms. Slavick lost her temper at her mother-in-law and slammed her down in a chair, physically assaulting her. The description by Ms. Slavick that she some how clinically tried to use a professional hold on her mother in law to restrain and calm her rings hollow and untrue. The plaintiff was infuriated that her mother in law told her she was not welcome in the Slavick home because she was not respectful toward her (the elder, Mrs. Slavick). The plaintiff lost control of herself and grabbed her mother-in-law by her wrists, slamming them into her chest as she violently thrust her in a chair. She screamed and yelled at her mother-in-law. Tyler was right there, watching all the CT Page 9051 while. This was a very troubling incident. The plaintiff's inability to control her temper extends beyond just toward the defendant, but also to an elder more vulnerable person as well. In her testimony and demeanor, the plaintiff showed no insight as to the inappropriateness of her behavior or its effect on Tyler, as well.
The plaintiff has asserted to this court that Tyler was enrolled in St. Mary's without her knowledge. This is wholly unbelievable. It also was never raised by the plaintiff with Family Relations. Tyler has done generally well at St. Mary's School. However, it has been noted that he has difficulty managing any changes to his schedule showing great uncertainty and anxiety when it occurs. Tyler went to a psychologist for an evaluation a little over one year ago. He was having some sleep difficulty, somatic complaints and the urge to go to the bathroom frequently. He showed some immaturity and self doubting as well as a need to please. The psychologist found this all consistent with Tyler's tumultuous family situation, witnessing of parental conflict, and insecure bedtime habits. The goal then for Tyler is to lessen the parental conflict for him, place him in a framework of a secure and reliable schedule with secure bedtime habits as well.
While Tyler is too young to express an intelligent choice or preference as to his living arrangements, he is able to express the comfort he feels in living in the Slavick household where his aunt Barbara Slavick lives. This is perceived by the court as a comfort from not only her personality but also this home represents a place of continuity of comfort and care since Tyler's birth.
Mr. Slavick has engaged in certain conduct toward the plaintiff which is troubling. His decision to document the amount of time she spent at the health club with the children is a poorly reasoned one. In his zeal to attempt to document this time, he has done so without consideration to insight of her feelings that he was invading her privacy. His choice this year to join the same health club (even if it had been his as well, historically) was also poorly reasoned and insensitive to the privacy the plaintiff seeks away from him. Similarly, his taping of her fury was also rude and invasive. Mr. Slavick may have felt the frustration of no ability to explain or prove what happened in their private home, but he went beyond the boundaries of privacy by taping; this is poor judgment as well. Mr. Slavick's improper conduct is to be condemned. However, the boundary problems he has demonstrated have not been while the children are in his care. When he has found them at the gym unattended by their mother, he has acted without placing them in the middle of a tense situation and still provided them the supervision they needed.
There is no question that both of these parties have the skills to CT Page 9052 manage the day to day tasks of parenting, that is, meeting the essential bodily needs of the children. Mr. Slavick, however, has demonstrated more insight and maturity regarding the needs of these children for a stable, predictable and nurturing home. During the marriage he sought counseling with Ms. Slavick to stabilize their situation for the benefit of the children. After a couple of months, Ms. Slavick refused to continue attendance, although it was the only place they were communicating with each other. He has decided to live in the stability of his extended family seeing it as a place for support in the raising of these two children. Ms. Slavick seeks to portray it as indicative of his inability to stand on his own, instead. Both of these parents have deficiencies in their skills in dealing with life. Mr. Slavick while taking care of his children sees the benefit of an extended family to aid him in this process. In this family, this is an asset for these children. They are very deeply attached to their aunt as well as comfortable in the Slavick home that his been the center of so much of their security since birth. Ms. Slavick is concerned that this environment does not promote a message of independence to the children. Mr. Slavick however, is gainfully employed providing a fine role model there, an able parent who is also respectful and appreciative of the support of an extended family.
Ms. Slavick has to her great credit made significant strides in gaining control of her self since her psychiatric hospitalization in February, 1999. As comfortable as Mr. Slavick is living in an extended family environment, Ms. Slavick is equally uncomfortable, feeling the need to live independently. She is proudly, now as of the beginning of this year, a self supporting individual who has put herself together and is living with stability on her own.
Mr. Slavick is a devout Roman Catholic and is raising the children in that religion if they stay with him. Ms. Slavick, while raised Catholic herself, feels it is ultimately important that the children be permitted to find their own path in regard to religion. She has acknowledged and agreed that since they are going to be attending Catholic parochial school, that their parents (she and the defendant) should ensure their attendance at church, church education and similar activities since it is expected of them as Catholic students at St. Mary's. The children were baptized Catholic by their parents.
These children need the stability of a reliable schedule. Mr. Slavick has demonstrated an ability to make this a priority. The court finds that the plaintiff has not demonstrated the same reliability. She has placed her own perceived fitness needs above her exclusive time with the children. At times it results in a late dinner for the children, as well. She has not been able to follow through on the need to provide and enforce Tyler's bedtime in his own bed while all the while stating she CT Page 9053 felt it was important for him. She made only one attempt to do so in several years, over a week she was not working.
In considering all of the above, the court finds that in considering only the two parents as custodial choices, it is in the best interests of Tyler and Emily to grant sole custody of them to their father. Because of the lack of trust and inability of the parties to communicate effectively, there is a necessity for an ironclad specific schedule of visitation that is not vulnerable to manipulation by either party.
The tuition for St. Mary's is set by the Diocese. Presently, it is $2,525 per year. The tuition for the Trinity Day School will be $1,700 next year, if that is the preschool Emily attends.
Mr. Slavick has a personal injury action pending. The parties have stipulated that a demand of $15,000 has been made and an offer of $5,000 has been received regarding it.
During the pendency of this action, the defendant received a worker's compensation settlement which netted him $4,063. The award was for a permanent partial loss of a portion of his upper arm. He utilized the funds to pay about $2,200 in bills and the balance went toward his divorce attorney fees. The funds were received about one year ago.
The plaintiff had approximately $2,300 in a 401k fund at the inception of this action. She spent this during the pendente lite period.
There is an accrued unpaid storage fee for the parties personal furnishings which are in storage. At the time of the hearing it is $1,088.
The plaintiff has no other assets to speak of other than the automobile she drives which is valued at $4,500. She also has accumulated savings bonds in her possession belonging to the children worth about $2,000. Besides the credit card indebtedness described earlier she has a student loan of $8,900, attorneys' fees, a personal loan and other small debt as listed on her financial affidavit.
The defendant, as well, has no other assets than a nominal amount in his bank account and the stored furnishings (as well as the above-mentioned personal injury claim). He has debt on top of the credit cards, to his attorney, the Internal Revenue Service for $7,000, back rent of $8,000 and other personal debt as listed on his financial affidavit.
Attorney for the minor children has an unpaid balance of $3,975 CT Page 9054 including $2,000 for the trial. The parties have stipulated to its reasonableness. To date prior to trial on an even split of the fees, the plaintiff owed her $1,105.00 and the defendant owed her $875.00.
The child support guidelines provide a presumptive current support to be paid by the plaintiff to the defendant in the amount of $155.00 per week. The court finds no reason to deviate from that amount. Under the guidelines this provides the parties with net disposable income as follows: plaintiff, $341.00 or 31.40% of the combined net disposable income and the defendant, $745.00 or 68.60% of the combined net disposable amount.
The court orders:
Dissolution of the marriage
Sole legal custody of the minor children to the father; physical custody of the minor children to the father. Reasonable rights of visitation to the mother as follows: every other weekend from Friday at 6 p.m. to Sunday at 6 p.m.; every Tuesday from 4 p.m. to 6 p.m. and on the alternate Friday from 4 to 7 p.m. The weekend after the notice of these orders shall be with the mother.
The following holiday and vacation schedule shall supersede and take precedence over the regular weekly schedule:
The mother shall have the children every Mother's Day from 9 a.m. to 6 p.m; the children shall be with their father every Father's Day from 9 a.m. to 6 p.m.
The children shall spend Thanksgiving in even years with their father and in odd years with their mother (from 4 p.m. on Thanksgiving eve to 7 p.m. on Thanksgiving Day).
The children shall spend every Christmas Eve with their father from 9 a.m. to noon on Christmas Day and every Christmas Day with their mother from noon to 6 p.m. on the 26th of December.
The children shall alternate Easter (9 a.m. to 6 p.m.) with their parents, with the mother in the even years and the father in the odd years.
The children shall be with their mother on Martin Luther King Day and Memorial Day and Columbus Day, if she has those days off week, from 9 a.m. to 6 p.m. The other Monday holidays and Veterans' Day, the children shall be with their father. CT Page 9055
Each party is entitled to three uninterrupted weeks of vacation with the children that shall not be consecutive. The mother shall give the father notice of the time she elects by March 1 of each year. Her vacation time may not include the week immediately prior to the children's return to school after summer. If she fails to so notify the father, her vacation time with the children shall be arranged around the children's schedule and the vacation plans of the father. The father shall give the mother notice of the three weeks he has elected by April 30th of each year. The mother shall provide the transportation for her visitation.
The father shall provide the mother timely notice of all of the children's extracurricular activities and school events and she may participate in them or view them as may be appropriate with the event. The father shall provide the mother timely notice of any religious, health, educational or other developmental decision he has made regarding the children. In the event of emergency while the children are in either party's care, that parent shall give notice to the other of the same as soon as possible. The father shall provide the mother with timely notice of non-emergency appointments regarding the children's health, education or religious upbringing and the mother may attend them as well.
Each party may speak to the children daily by telephone (briefly) when the children are in the other party's care.
The plaintiff shall pay the defendant child support in the amount of $155.00 per week by immediate wage withholding. An Advisement of Rights form shall be executed by the plaintiff and submitted to the court within 14 days of these orders.
The defendant shall pay the first $100.00 per child per year of health expenditures not paid by health insurance and thereafter, they shall be paid 31% by the plaintiff and 69% by the defendant, all pursuant to the child support guidelines regulations.
The defendant shall maintain the children on his health insurance as it is available through his employment. If it becomes unavailable, he shall notify the plaintiff and if it is available to her, she shall maintain it. If neither has insurance available through their employment for the children in the future, the defendant shall attempt to insure them through the HUSKY plan.
Pursuant to the parties agreement to pay for parochial school for their children as well as preschool for Emily, the court orders that it shall be paid 69% by the father and 31% by the mother in a timely manner in CT Page 9056 accordance with a payment plan approved by the respective schools.
The defendant shall within 21 days pay all the accrued storage charges on the family furnishings and sign any necessary releases so the plaintiff may remove the property from storage. The plaintiff is the sole owner of all of the stored belongings free of any claim from the defendant.
The parties are the sole owners of each and every asset in their respective possessions free and clear of any claim of the other (including automobiles). The parties shall each execute the paperwork necessary to effectuate the same upon its presentation by the other party. The plaintiff is not entitled to any portion of the defendant's personal injury claim or any reimbursement of any portion of the worker's compensation claim all ready received by him.
The parties are ordered responsible for debt of the marriage as follows:
The plaintiff is solely responsible for the Citibank Visa and Mastercard in her name on her financial affidavit and all other debt on her financial affidavit except as provided hereinafter. The defendant is solely responsible for the Discover, Household Bank and Wells Fargo card balances. He shall indemnify and hold the plaintiff harmless regarding the bills. He is also solely responsible for all the other debts on his financial affidavit. The plaintiff shall pay $2,105.00 and the defendant shall pay $1,875.00 to Attorney Foster (attorney for the minor children) in accordance with terms acceptable to her.
No alimony is ordered to either party.
Each party shall pay their own attorney fees.
The plaintiff shall be entitled to claim Tyler as a dependency exemption yearly on her tax returns if she is current in her child support as of the end of that year.
The parties shall maintain such life insurance as available to them through their employment (without proof of insurability [group plan], where it is offered as a cost-free benefit incident of their employment), for the benefit of the minor children.
It is so ordered.
The court,
MUNRO, J. CT Page 9057